UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**BANK OF BARODA, NEW YORK BRANCH,**

        **Plaintiff,**

    -against-

**KEJRIWAL NEWSPRINT MILLS, LLC D/B/A RESOURCE REUTILIZATION LLC, AND RACHNA KEJRIWAL,**

        **Defendants.**

**21-cv-6982 (ALC)**

**OPINION & ORDER**

**ANDREW L. CARTER JR., United States District Judge**:

Plaintiff/Counterclaim-Defendant Bank of Baroda, New York Branch (the "Bank") moves for summary judgment on its claims for (1) breach of a promissory note and (2) breach of a guaranty agreement by Defendants/Counterclaim-Plaintiffs (1) Kejriwal Newsprint Mills, LLC doing business as Resource Reutilization, LLC ("KNM" or "Borrower") and (2) Rachna Kejriwal ("Ms. Kejriwal" or "Guarantor") (together, the "Defendants"), respectively.  The Bank also moves for summary judgment against Defendants' counterclaim for breach of contract based on the implied covenant of good faith and fair dealing.  For the reasons set forth below, the Bank's summary judgment motion is **DENIED** in its entirety.

## BACKGROUND

### I. Statement of Facts

This case involves agreements for a revolving line of credit extended by the Bank to Defendants, which was signed on December 27, 2018.  Although a summary judgment motion on a breach of contract claim is usually anchored to the four corners of an agreement, a determination of summary judgment as to Defendants' Counterclaim requires the Court to take a step back to consider the history between the Bank and Defendants.  This factual history is

1

derived from the Complaint, *see* ECF No. 5-1 ("Compl."), the Counterclaim, *see* ECF No. 13 ("Counterclaim"), the parties' 56.1 statements, *see* ECF Nos. 79-1, 81, their briefs, *see* ECF Nos. 79, 80, 82, and documents relied upon therein.[1]

According to the sworn affidavit of KNM's now-sole owner and member, Rahul Kejriwal ("Mr. Kejriwal"), Defendants had been a customer of the Bank since 2003. ECF No. 80-1 ¶ 3. In approximately 2014 or 2015, Defendants began meeting regularly with the Bank to establish working capital limits for exporting recycled fiber and newsprint from the United States, in connection with Defendants' business. *Id.* ¶ 5.

After the business grew in mid-2018, Defendants had conversations with the Bank about the business's further growth, and the parties discussed working with the Bank to provide bill discounting and letters of credit in support of its growth plans. *Id.*; *see also* ECF No. 80-4 (a June 19, 2018 email from Ms. Kejriwal to ce.usa@bankofbaroda.com, CREDIT.USA@bankofbaroda.com, and others stating "We look forward to the trading limits for the newsprint business. Attached are the proposal documents as we have been discussing and some of the requirements from our customers: Proposal value of $10 Million for Vendor LC . . . Proposal value of $10 Million for Bill Discounting of Customer LCs - overall $10 Million to also include $1 Million of DP/DA discounting on AAA customers.").

The Defendants allege that these discussions caused the Bank to solicit Defendants in late 2018 to open a "small limit, overdraft, of about $400,000, with the understanding that it would be increased soon thereafter once a demonstrated need arose, and [the Bank] explained that this was known as an Overdraft Limit, in which the sales documents, after shipment, would be

---

[1] Unless otherwise stated, the facts are undisputed by the parties. Any disputed facts are viewed "in the light most favorable to the part[ies] opposing summary judgment and drawing all reasonable inferences in [their] favor." *Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022).

presented to [the Bank], and then [the Bank] would send the documents to Defendants' customer's bank." ECF No. 80-1 ¶ 6. Defendants allege that—with this overdraft limit in place—so long as the sales documents were under a letter of credit, these documents would be immediately discounted. *Id.* Moreover, if there was no limit sanctioned and if the documents were under a letter of credit, then (upon acceptance of the documents at Defendants' customer's bank), the funds would be discounted at the Bank (or any bank) for Defendants' use for further business. *Id.* Moreover, the Bank purportedly confirmed that this arrangement would cover the requirements of Defendants' recycled fiber business and its newsprint business. *Id.* ¶ 7.

Although the Bank disputes some of Defendants' backstory (which Defendants allege resulted in the credit arrangement in question, *see id.* ¶ 8) there is no question that on December 27, 2018, the Bank entered into a Credit Agreement with Defendants in which KNM was designated as the Borrower and Ms. Kejriwal (then-president of KNM) as the Guarantor. ECF No. 81 ¶ 2, 8; *see also* ECF No. 5-1. The parties also largely do not dispute the four corners of the Credit Agreement as well as the terms of the other governing documents. Under the Credit Agreement, the Bank agreed to extend certain revolving credit facilities to KNM up to a maximum principal amount of $400,000. ECF No. 81 ¶ 2. The Credit Agreement was executed contemporaneously with other governing documents, including a Promissory Note also dated December 27, 2018 and executed by Ms. Kejriwal on KNM's behalf. *Id.* ¶ 3; *see also* ECF No. 5-2. Under the Promissory Note, default interest accrued beginning on July 1, 2020 at the rate of 3-month USD LIBOR plus a spread of 300 basis points per annum. ECF No. *Id.* ¶ 4.

Both the Credit Agreement and Promissory Note contain provisions requiring that KNM pay the principal of $400,000 plus all interest on demand by the Bank if KNM were to trigger a default due to certain events including, but not limited to, failing to pay the principal or interest

3

timely; failing to adhere to obligations or covenants (such as submitting financial statements, routing all sales through the overdraft account, advising of name changes and control changes); and if any representation or warranty by KNM at the time of execution was false.[2] *Id.* ¶ 5. Under Section 3.11 of the Credit Agreement, the Bank "reserves the right to cancel the Credit Facility, fully or partially, if in its opinion (i) there has been a deterioration of the financial condition of Borrower, (ii) Borrower is not compliance with the terms and conditions of this Agreement or (iii) Borrower has not been utilizing the Credit Facility fully or partly." *Id.* ¶ 19, *see also* ECF No. 5-1 § 3.11. Moreover, any event of default in the Credit Agreement is considered an event of default under the Promissory Note. ECF No. 81 ¶ 14.

Additionally, on December 27, 2018, Ms. Kejriwal entered into a Guaranty Agreement in her personal capacity, thereby becoming personally liable for any outstanding amounts owed by KNM under the Credit Agreement and related documents and promising the punctual and complete payment and performance of KNM to the Bank. *Id.* ¶ 7, 15. Last, on December 27, 2018, Ms. Kejriwal entered into a Security Agreement in her capacity as president of KNM. *Id.*

---

[2] Defendants make much of the Bank's more general allegation in the Complaint that, in addition to Borrower's failure to pay the acceleration of the loan, the Borrower "is also in default under various provisions of the Credit Agreement." *See* Compl. ¶ 11. In its summary judgment motion, the Bank articulates these other breaches to be Defendants' (1) failure to seek the Bank's consent prior to changing KNM's name; (2) failure to seek the Bank's consent before selling its assets; (3) entering into a transaction with an affiliate of the Borrower without the Bank's consent; and (4) failure to provide required financial documents to the Bank. *See generally* ECF No. 79. In Defendants' view, it is inappropriate to "raise[] [these specific breaches] now for the first time on a motion for summary judgment." ECF No. 80 at 5. These arguments are mooted by the contours of this case, particularly where the Court concludes there is a triable issue of fact as to whether the Bank breached first. But if the Court had not credited any defenses to Defendants' breach and granted the Bank's motion, it could have done so based solely on Defendants' failure to pay. *See Bank of Baroda v. Harsh Imports, Inc.*, No. 1:22-CV-2257, 2023 WL 2601613, at *2, n.4 (S.D.N.Y. Mar. 22, 2023) ("The Agreements contain many additional provisions, including those related to the Borrower's duty to comply with certain reporting requirements. . . . Because . . . the Court finds the Borrower's failure to pay interest in compliance with the Agreements' terms sufficient to resolve this case, it need not further detail the other provisions of the Agreements."). By the same token, because the Bank's breach of the covenant of good faith and fair dealing (if proven) temporally precedes any the other defaults alleged by the Bank, the Court need not reach the issues of waiver on summary judgment.

¶ 8. All of the credit facility agreements are governed by New York law. *See* ECF No. 5-1 § 9.08; ECF No. 5-2 § 11; ECF No. 5-3 at 2; ECF No. 78-1 § 7.05.

The Bank alleges that a standard borrower-lender relationship continued without event until—after uncured multiple breaches of the Credit Agreement by KNM—the Bank sent a demand letter dated July 16, 2020 seeking the repayment of the then-outstanding loan amount ($290,209.99, plus interest and other charges), also invoking the Guarantor's liability via letter that same day. ECF No. 80 ¶ 9, 20. The breaches specified in the demand letter included, but were not limited to: deficient borrowing base statements for December 2019 and February 2020; insufficient turnover of KNM's receivables; and inconsistencies in KNM's reported financial information beginning in January 2019. *Id.* ¶ 20; *see also* ECF No. 5-4 at 1 (explaining the basis for the demand letter, pointing to prior correspondence in June 2020, and noting that "the deposits in the account are far and insignificant"). The demand letter states:

> Given that there is a Breach of the terms of the Agreement for the Credit facility and also the various irregularities mentioned above, in terms of Section 3.11 (Right to Cancel the Credit Facility), we hereby recall the credit facility sanctioned to the company and you are hereby called upon to pay the total outstanding dues of US$ 290,209.99 plus the amount of interest accused and other charges from 1st July 2020 till the date of payment of the amount.

ECF No. 5-4 at 5. To date, KNM and Ms. Kejriwal have not paid the amount owed as a result of the Bank's July 16, 2020 acceleration demand. ECF No. 81 ¶ 21. The Bank contends that Defendants' failure to pay constitutes breaches of Section 3.01 and Section 8.01 of the Credit Agreement. *Id.* ¶ 22; *see also* ECF No. 5-1 at §§ 3.01, 8.01. Although Defendants do not dispute that the demand letters were sent, they dispute that they, in fact, owe the Bank anything. *See* ECF No. 81 ¶ 21.

This is because—according to Defendants—the story is not so simple. Indeed, the viability of the Bank's motion hinges on a purported prior breach by the Bank alleged by

Defendants in their Counterclaim. *Id.*; *see* Counterclaim ¶¶ 26–64. Defendants contend that, under the line of credit arrangement with the Bank, KNM was required to route all of its business through the Bank and, as such, KNM immediately began utilizing the letter of credit process with the Bank. ECF No. 80-1 ¶ 9. By January 2019—around a month after the credit facility agreements were signed—KNM was submitting letters of credit drafts to the Bank. *Id.*; *see also* ECF No. 80-5. KNM contends that by June 2019, it had business through discounted letters of credit with the Bank worth upwards of $430,000. ECF No. 80-1 ¶ 10; *see also* ECF No. 80-6 ("It was a pleasure seeing you last week and explaining KNML's huge growth. . . . We have LCs at BOB NY for waste paper . . . Total LCs of Value: $432,500 at Bank of Baroda over the last 2 months[.] To fulfill these orders, we need a pre-shipment credit of $400,000.").

However, in early-to-mid 2019, KNM made some shipments of recycled fiber under a 180-day letter of credit received by the Bank. ECF No. 80-1 ¶ 11. Defendants attest that these shipments were received by Defendants' customers, but Defendants were not paid for these shipments. *Id.* According to Defendants, the Bank had no explanation for why this occurred given that the bill of lading was sent through the bank documents. *Id.* Defendants allege that the Bank lost these funds by not insisting to the counterpart bank that—since the shipment had been accepted by the customer—the payment needed to be made and, further, that the Bank failed to discount the funds as it should have per their arrangement. *See id.* ¶¶ 12–13. Defendants allege that this caused a €65,469.34 loss, thereby affecting their cash flow and, thus, their ability to keep a fixed deposit with the Bank of $75,000 for the working capital limit (though Defendants say this requirement was later satisfied). *Id.* ¶ 14.

Defendants also assert that, in October 2019, another business opportunity worth $2.6 million was lost after Defendants reached out to the Bank for a letter of credit and the Bank—

6

contrary to the purported customary course of business since the credit line was opened—failed to open the letter of credit. *Id.* ¶ 18. Defendants allege that, in other occasions through the rest of 2019 and into 2020, the Bank accepted documents from Defendants, but did not open or discount letters of credit. *Id.* ¶¶ 19–20.

Separately, the undisputed record shows that KNM approached the Bank with a plan to register for a program maintained by the Small Business Administration ("SBA") that would apply to the financing of letters of credit. *Id.* ¶ 15; ECF No. 81 ¶ 47. The Bank contends that KNM approached them on or about August 22, 2019 with a plan to register for this program, *see* ECF No. 81 ¶ 47, but other evidence suggests Ms. Kejriwal contacted the Bank about this program as early as March 13, 2019. *See* ECF No. 80-7. Defendant purports that the SBA program would have insured a participant's exports up to $5 million by insuring their lender (in Defendant's case, the Bank) 95% of the receivables. *See* ECF No. 80-1 ¶ 15. Defendants contend (and the record indicates) that the SBA program required the Bank to upload the required documentation. *Id.* ¶ 16; *see also* ECF No. 80-10 (a June 25, 2019 email from an SBA employee to "Kejriwal NYC" purporting to show that only approved partner lenders, and not borrowers, could upload application information and also indicating that the Bank received onsite training in relation to the SBA program on April 16, 2019).

The Bank states that because it was not previously on the SBA's list of approved financial institutions, additional work was needed with respect to KNM's SBA application. ECF No. 81 ¶ 49. The Bank also states that it attempted to work with KNM, but that KNM failed to cooperate and respond to the Bank's requests. ECF No. 81 ¶¶ 50–51; *see also* ECF No. 78-9 at 1–2 (an August 19, 2019 email from credit.usa@bankofbaroda.com to Ms. Kejriwal noting "In addition, we have also not received any of the statutory documents to be uploaded onto the SBA

7

electronic system and the reference/approval against which the same are to be uploaded.  Please clarify.").  Defendants dispute this, contending instead that the Bank offered to work with KNM to register for the SBA program, but then failed to do so.  ECF No. 81 ¶¶ 50–51; *see also* ECF No. 80-9 (a June 25, 2019 email from "Kejriwal NYC" to credit.usa@bankofbaroda.com indicating that the SBA employee "confirmed that [the documentation had] to be uploaded from Bank of Baroda" and attaching "SBA documents for Kejriwal Newsprint Mills LLC" that "the Lender, Bank of Baroda will have to include").  Defendants assert that the Bank's failure to assist them with the SBA program caused them to fail to enhance their own capital limits, thereby losing millions of dollars due to the loss of existing business opportunities.  ECF No. 80-1¶¶ 16–17.

The parties do not dispute that the credit facility agreements do not expressly obligate the Bank to either maintain a letters of credit facility for KNM's benefit generally or specifically to join the SBA program.  ECF No. 81 ¶ 48.  Rather, Defendants contend that the Bank's separate actions (and inaction) during the course of the contractual relationship frustrated their agreements, summing up their position as follows:

> It was in fact [the Bank's] inaction and lack of cooperation that interfered with KNM's reasonable expectations based on the very premise of why the overdraft line was opened and our relationship with [the Bank,] and which caused the alleged breach of which [the Bank] now complains.  [The Bank] cannot cause us millions of dollars in lost business and relationships, and then complain when we are unable to pay back our loan.  Had [the Bank] not violated our reasonable expectation and frustrated the very purpose of our relationship with [the Bank], we would have made millions of dollars in profit and been able to easily pay back the outstanding amount and keep the credit line and relationship going.

ECF No. 80-1 ¶ 24.

## II.    Procedural History

On August 19, 2021, the Bank filed this action. ECF No. 1. On August 23, 2021, the Bank filed its Complaint, which alleged a breach of a promissory note by Borrower and a breach of a guaranty agreement by Guarantor. ECF No. 5. On November 1, 2021, Defendants filed their Answer and Counterclaim, which raises an affirmative defense: a purported prior breach by the Bank and, specifically, makes a counterclaim against the Bank for breach based on the implied covenant of good faith and fair dealing. ECF No. 13. On December 15, 2021, the Bank filed its Answer to the Counterclaim. ECF No. 16. On November 2, 2021, the Court referred this case to Magistrate Judge Debra C. Freeman for general pretrial matters.[3] ECF No. 14.

Following discovery in this case, on October 9, 2024, the Bank filed its motion for summary judgment along with its supporting brief and declarations. ECF Nos. 76–79. On November 6, 2024, Defendants filed their opposition brief, supporting declarations, and counterstatement of facts. ECF Nos. 80–81. On November 20, 2024, the Bank filed its reply brief. ECF No. 82.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts are facts that may affect the outcome of the case. *See Anderson*, 477 U.S. at 248. An issue of fact is "genuine" when a reasonable fact finder can render a verdict in the nonmoving party's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

---

[3] On April 30, 2022, the referral was reassigned to Magistrate Judge Valerie Figueredo. *See* Minute Entry of April 30, 2022.

9

574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation omitted). "[T]he court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (quoting *Marvel Characters v. Simon*, 310 F.3d 280, 285–86 (2d Cir. 2002)) (internal quotation marks omitted). If the moving party meets its burden, the burden shifts to the non-moving party to bring forward "specific facts showing a genuine issue for trial." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-cv-7354, 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016); *see also* Fed. R. Civ. P. 56(c).

The non-moving party "may not rest upon mere allegation[s] or denials of [their] pleadings." *Anderson*, 477 U.S. at 259. Rather, the non-moving party must "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), and these facts must be "admissible in evidence." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (citing Fed. R. Civ. P. 56(e)). "The mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment, and "[i]f the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Anderson*, 477 U.S. at 247 (emphasis in original), 250 (internal citations omitted).

## DISCUSSION

The Bank moves for summary judgment on both of its claims in the Complaint and against Defendants' Counterclaim. *See* ECF No. 76. Although Defendants make timeliness arguments as to certain of the Bank's allegations of default, it is undisputed that Defendants did not pay the amounts owed under the Credit Agreement and Promissory Note. It is also undisputed that the credit facility agreements do not contain any provisions obligating the Bank to issue letters of credit on behalf of Defendants or concerning the SBA program at all. Rather, Defendants' contention is that the Bank breached first by violating Defendants' reasonable expectations as to the agreements and frustrating their purpose, thereby absolving Defendants from any further performance, *i.e.*, paying the amounts owed. Defendants argue that if this is proven at trial, this would be a complete defense to the Bank's claims.

Thus, in deciding this two-pronged summary judgment motion, the Court's first task is to decide whether there is any genuine dispute of fact as to whether the Bank violated the implied covenant of good faith and fair dealing when it purportedly failed to follow through on facilitating letters of credit for Defendants and to support Defendants' application to the SBA program. Importantly, "[a] fact is material when it might affect the outcome of the suit under governing law" and "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (cleaned up). As the Court explains further below, it need not carry out its second task—determining whether there is any genuine dispute of fact as to whether

11

Defendants breached—given that there is a genuine dispute of fact that can support Defendants' defense against the Bank's claims.

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (internal quotation marks omitted). "In New York, one party's obligation to perform under a contract is excused only when the other party repudiates the contract or when the contract becomes impracticable or impossible, or when it becomes apparent that the contract was the product of a mutual mistake." *Evolution Markets, Inc. v. Alpental Energy Partners, LLC*, 221 F. Supp. 3d 361, 370 (S.D.N.Y. 2016) (citing *Camp Kennybrook Inc. v. Kuller*, 214 A.D.2d 264, 266 (1995)). "Moreover, a non-breaching party's contractual obligation to further perform on the contract will be excused if 'the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract.'" *Evolution Markets*, 221 F. Supp 3d at 370–71 (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc*., 111 F.3d 284, 289 (2d Cir. 1997)).

At issue here is a purported breach of the implied covenant of good faith and fair dealing. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (citations omitted). "While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp.*, 773 N.E.2d at 500–01 (internal quotation marks and citations omitted).

12

"In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties. . . . Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (internal quotation marks and citations omitted).

Some examples of conduct that frustrates a contract's purpose are "evasion of the spirit of the bargain," "lack of diligence and slacking off," "willful rendering of imperfect performance," and "interference with or failure to cooperate in the other party's performance." *See e.g.*, Restatement (Second) of Contracts § 205 cmt. d.  However, "[t]he implied covenant 'cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *See Fesseha v. TD Waterhouse Inv. Servs.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003) (citing *Interstate Adjusters, Inc. v. First Fid. Bank, N.A.*, 251 A.D.2d 232, 234).

In this case, for Defendants to avoid summary judgment, the Court must first be able to find—with the benefit of the full record and making all reasonable inferences in Defendants' favor—that some genuine dispute of material fact exists as to whether there are any implied obligations by the Bank.  The Court concludes that there is such a dispute.

The Bank's main argument on this point is that "Defendants can only succeed upon a showing that the Bank had obligations consistent with the Credit Agreement and related agreements' central purpose, despite not being set forth in the black letter of the agreements." ECF No. 82 at 11 (citing *Wu v. JP Morgan Chase Bank, N.A.*, No. 23-cv-763, 2024 WL 732116,

13

at *3 (S.D.N.Y. Feb. 22, 2024)).  The Bank concludes that, consequently, it is not liable on Defendants' theory regarding either of those issues "because they were not part of the parties' contemplations in executing the Credit Agreement."  ECF No. 82 at 11.  In support of this, the Bank notes the Defendants' concession that the parties did not bargain for a provision for letters of credit facility or anything regarding an SBA program in the credit facility agreement.  *Id.*  Moreover, the Bank points to evidence that suggests Defendants' ability to pay was not solely caused by any alleged misconduct by the Bank.  *Id.*  The Bank adds that "not rescuing KNM from financial hardship is not a breach of the Credit Agreement because the Bank had no obligation to."  *Id.* at 11–12.

But Defendants' entire counterclaim is premised on the fact that the credit line was purportedly introduced to them by the Bank in the context of the Bank facilitating letters of credit and bill discounting for Defendants.  *See* Counterclaim ¶¶ 30–32 ("Defendants asked for an explanation [as to the credit limit], and Plaintiff advised that these were known as an Overdraft Limit, in which the sales documents, after shipment, would be presented to Plaintiff, and then Plaintiff would send the documents to Defendants' customer's bank. . . . With a limit in place, if the documents were under a Letter of Credit ('LC'), then the documents would be discounted immediately.  If there was no limit sanctioned, and if the documents were under LC, then upon acceptance of the documents at the customer's bank, the funds would be discounted at Plaintiff, or any bank for Defendants' use for further business.").

Other than Mr. Kejriwal's sworn affidavit[4] and Ms. Kejriwal's deposition testimony[5] as to the premise of the credit line, there is some documentary evidence from which the Court can reasonably infer that these separate facilities could have been the purpose of the eventual revolving credit line, even if this is not expressly outlined in the agreements. *See* ECF No. 80-4 at 5 (a document dated April 4, 2018, which was signed by Ms. Kejriwal and attached to a June 19, 2018 email to ce.usa@bankofbaroda.com and CREDIT.USA@bankofbaroda.com, which seems to specify "[t]he basis on which Requests for each of the above credit facility is made" to be the opening and discounting facilities for letters of credit).

Still, if a factfinder were to conclude that the purpose of the credit line was to facilitate letters of credit and bill discounting, they would also need to consider whether the Bank breached such obligations. Thus, the Court next determines if there is a genuine dispute as to whether the Bank failed to either accept documents from Defendants or failed to open or discount letters of credit and, if so, whether such a breach "defeats the object of the parties in making the contract.'" *See Frank Felix*, 111 F.3d at 289. The Court concludes that there is a genuine dispute.

The Bank points to evidence in the record showing that "the purported early-to-mid 2019 letters of credit were actually rejected by the customer and so KNM's failure to obtain payment was not due to the Bank's conduct but rather some other cause over which the Bank had no control." ECF No. 82 at 10 (citing ECF No. 80-18 at 14). However, upon review of the contents of the cited document and Mr. Kejriwal's explanation of the document in his declaration, the

---

[4] "It was in fact Plaintiff's inaction and lack of cooperation that interfered with KNM's reasonable expectations based on the very premise of why the overdraft line was opened and our relationship with Plaintiff, and which caused the alleged breach of which Plaintiff now complains." ECF No. 80-1 ¶ 24.

[5] "So when we approached Bank of Baroda for the limits and we made our proposals to them -- so right from day one, our proposal was that we needed limits for the purpose of, one, of bill discounting, and number two, to opening letters of credit." ECF No. 82-3 at 32:15–21.

Court cannot construe this document as evidence of a customer's rejection. *See* ECF No. 80-1 ¶ 19 (Mr. Kejriwal explaining that this exhibit purports to show that "[the Bank] was still discounting LC's for us at this time, as in December 2019 they were discounting LC's for us"). In fact, Defendants cite to evidence purporting to show them complaining to the Bank in November 2019 that it had not discounted the documents in relation to a letter of credit for a customer who had accepted a consignment weeks prior. *See* ECF No. 80-15.

The Court can reasonably infer from such evidence that this could show a breach of an obligation that "[Defendants] would be justified in understanding [was] included" in their bargain. *See 511 W. 232nd Owners Corp.*, 773 N.E.2d at 500–01. Insofar as Defendants reasonably expected that "[w]ith a limit in place, if the documents were under a Letter of Credit ("LC"), then the documents would be discounted immediately[,]" *see* ECF No. 80-1 ¶ 6, then Defendants' evidence of the Bank accepting documents from Defendants—but not immediately opening or discounting letters of credit—therefore presents a genuine dispute as to whether certain failures were the Bank's fault or Defendants' customers fault.

Moreover, the Bank argues that "[t]he undisputed documentary evidence demonstrates that Defendants were in breach of the Credit Agreement since December 2019, [at] the latest, and throughout 2020" and that, therefore, "[t]he purported breaches by the Bank must have occurred prior to 2020 to excuse Defendants' breaches." ECF No. 82 at 9. Here, where the Court can reasonably infer from the record that the Bank could have breached the implied covenant of good faith and fair dealing as early as November 2019, it can safely place one breach before the other for the purposes of denying the Bank's summary judgment motion.

Insofar as Defendants' counterclaims complain of the Bank's ineffective assistance in securing KNM's participation in the SBA program, it is undisputed that "KNM approached the

16

Bank with a plan to register for a program maintained by the [SBA] that would **apply to letters of credit financing**," ECF No. 81 ¶ 47 (emphasis added), but the parties disagree as to who failed to cooperate. Applying a similar analysis as further above: if a factfinder determined that the central purpose of the credit line was to support Defendants' procuring of letters of credit, then it would also need to determine whether the Bank's purported failure to cooperate with the SBA application (which would apply to letters of credit financing) could also amount to breach of the implied covenant of good faith and fair dealing.

With the complete record before it, the Court cannot conclude that there is no dispute as to whether the Bank's decisions are simply "commercial preferences" with no implications on the parties' contractual rights. *Cf. Bank of Baroda*, 2023 WL 2601613, at *7 ("[T]he Bank is entitled to exercise its contractual rights in accordance with its commercial preferences, so long as it does so within the terms of the agreements."). Rather, the Court can draw reasonable inferences in favor of Defendants that create a genuine dispute of material fact as to whether the Bank had other obligations to Defendants and, if it is determined that they did, whether any breach harmed Defendants' further business to such an extent that it frustrated the object of the line of credit for Defendants. *See Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) ("The Bank's bad faith in handling the letters of credit and in causing [a business's] demise, if proved, would be a complete defense to the guaranty signed by [the plaintiff.]"); *Canterbury Realty & Equip. Corp. v. Poughkeepsie Savings Bank*, 135 A.D.2d 102, 107–08 (3d Dept. 1988) (reversing summary judgment as to claim that bank's wrongful actions caused suspension of business, thereby triggering the acceleration of a loan).

Only a factfinder at trial can resolve the remaining disputes. Thus, the Court must deny the Bank's summary judgment motion.

**CONCLUSION**

For the reasons stated above, the Bank's motion for summary judgment is **DENIED**. The parties are **ORDERED** to appear before the Court for an in-person joint status conference on **October 9, 2025 at 2 p.m** in Courtroom 444 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY. The Parties should be prepared to discuss next steps for trial and whether there have been any settlement discussions to date. The Clerk of Court is respectfully directed to terminate the pending motion docketed at ECF No. 76.

**SO ORDERED.**

**Dated:**   **September 30, 2025**
            **New York, NY**

**ANDREW L. CARTER, JR.**
**United States District Judge**